## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| *Plaintiff* | ) ) | |
| *v.* | ) ) | No. 2:19-cv-00139-JHR |
| JEFFREY E. WALL and THE LIGHTHOUSE EVENTS, LLC, | ) ) ) | |
| *Defendants* | ) ) | |

### MEMORANDUM DECISION AND ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT[1]

The Securities and Exchange Commission ("SEC"), the plaintiff in this securities-fraud

action, has filed an unopposed motion for summary judgment against defendants Jeffrey E. Wall

and The Lighthouse Events, LLC ("Lighthouse") on all three of its claims, alleging fraud in the

offer or sale of securities in violation of Section 17(a) of the Securities Act of 1933 (the "Securities

Act"), 15 U.S.C. § 77q(a), fraud in connection with the purchase or sale of securities in violation

of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b),

and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and unregistered offerings of

securities in violation of Sections 5(a) and (c) of the Securities Act, 15 U.S.C. §§ 77e(a) and (c).

*See* Complaint (ECF No. 1) ¶¶ 43-54; Plaintiff's Motion for Summary Judgment ("Motion") (ECF

No. 15) at 3-11.[2]

For the reasons that follow, I grant the motion and, consistent with the final judgment of

even date entered on the docket in this case, (i) permanently enjoin each of the defendants from

---

[1] The parties have agreed to have me preside over all proceedings in this action, including the entry of judgment. ECF No. 10.

[2] I have used the page numbers appearing at the bottom of the pages of the motion.

violating, directly or indirectly, Section 10(b) of the Exchange Act, Rule 10b-5 promulgated thereunder, and Sections 5 and 17(a) of the Securities Act, (ii) permanently enjoin each of the defendants or any entity owned or controlled by them from directly or indirectly participating in the issuance, purchase, offer, or sale of any security, provided that this shall not prevent Mr. Wall from purchasing or selling securities for his own personal accounts, (iii) adjudge the defendants jointly and severally liable for the disgorgement of $1,589,815 in profits gained as a result of the conduct alleged in the complaint, together with $202,056 in interest thereon, for a total of $1,791,871, and (iv) impose civil penalties in the sum of $1,589,815 against each defendant individually.

## I. Applicable Legal Standards

### A. Federal Rule of Civil Procedure 56

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014). "A dispute is genuine if 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party." *Johnson v. Univ. of P.R.*, 714 F.3d 48, 52 (1st Cir. 2013) (quoting *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)). "A fact is material if it has the potential of determining the outcome of the litigation." *Id.* (quoting *Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)). This approach is the same for unopposed motions because the "failure of the nonmoving party to respond to a summary judgment motion does not in itself justify summary judgment." *Lopez v. Corporación Azucarera de P. R.*, 938 F.2d 1510, 1517 (1st Cir. 1991); *Dimmitt v. Ockenfels*, 220 F.R.D. 116, 122 (D. Me. 2004), *aff'd*, 407 F.3d 21 (1st Cir. 2005). Rather, the court must still "inquire whether the moving party has met its burden to demonstrate undisputed

facts entitling it to summary judgment as a matter of law." *United States v. Foley*, 729 F. Supp. 2d 371, 373 (D. Me. 2010) (citation and internal quotation marks omitted).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Johnson,* 714 F.3d at 52. Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Brooks v. AIG SunAm. Life Assur. Co.*, 480 F.3d 579, 586 (1st Cir. 2007) (quoting *Clifford v. Barnhart,* 449 F.3d 276, 280 (1st Cir. 2006) (emphasis omitted)); Fed. R. Civ. P. 56(c). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

**B. Local Rule 56**

The evidence that the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the local rules of this district. *See* Loc. R. 56. The moving party must first file a statement of material facts that it claims are not in dispute. *See* Loc. R. 56(b). Each fact must be set forth in a numbered paragraph and supported by a specific record citation. *See id*. The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]" Loc. R. 56(c). The nonmovant likewise must support each denial or qualification with an appropriate record citation. *See id*. The nonmoving party may also submit its own additional

statement of material facts that it contends are not in dispute, each supported by a specific record citation. *See id.* The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement. *See* Loc. R. 56(d). Again, each denial or qualification must be supported by an appropriate record citation. *See id.*

Local Rule 56 directs that "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." Loc. R. 56(f). In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact." *Id.*; *see also, e.g., Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010); Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

## II. Factual Background

The plaintiff's statement of undisputed material facts in support of its motion for summary judgment, credited to the extent that those statements are supported either by the parties' joint statement of stipulated facts or by record citations in accordance with Local Rule 56, reveals the following.

Mr. Wall, age 56, is a resident of Freeport, Maine, and the founder and sole member of Lighthouse. Statement of Undisputed Material Facts in Support of Plaintiff's Motion for Summary Judgment ("Undisputed SMF") (ECF No. 16) ¶ 1; Joint Statement of Stipulated Facts Under Local

Rule 56(b) ("JSOF") (ECF No. 14) ¶ 1.  Lighthouse is a limited liability company operated out of Mr. Wall's residence.  Undisputed SMF ¶ 2; JSOF ¶ 2.  Prior to its formation as an LLC in April 2015, Lighthouse operated as an unincorporated entity for approximately seven years.  *Id.*  It describes itself as a Christian ministry that promotes, organizes, and hosts Christian music concerts and festivals.  *Id.*

In order to host a music concert or festival, Lighthouse must pay certain expenses upfront, such as deposits for artists and venues, radio promotions, and other production-related costs. Undisputed SMF ¶ 3; JSOF ¶ 3.  Lighthouse's primary source of revenue was ticket sales, which included advance sales on its website as well as direct sales at the music venue.  Undisputed SMF ¶ 4; JSOF ¶ 4.  Lighthouse processed advance ticket sales on its website by using a third-party payment processor to collect money and then transferring the money to a bank account that Mr. Wall used for all of Lighthouse's expenses.  Undisputed SMF ¶ 5; JSOF ¶ 5.

As early as 2014, Mr. Wall, both individually and on behalf of Lighthouse, began borrowing money from companies that provide short-term cash advances to small businesses in need of immediate cash flow.  Undisputed SMF ¶ 6; JSOF ¶ 6.  Mr. Wall and Lighthouse borrowed a total of approximately $700,000 from more than one dozen cash advance companies, with most of the borrowing occurring after mid-2016.  Undisputed SMF ¶ 7; Exh. C (ECF No. 16-3) thereto. Repayments of these cash advances from 2014 through October 2018, including interest, totaled approximately $1.1 million.  Undisputed SMF ¶ 8; Exh. C ¶ 9.

Mr. Wall and Lighthouse were unable to repay on schedule all of the debt incurred from cash advances.  Undisputed SMF ¶ 9; JSOF ¶ 7.  As a result, between October 2017 and June 2018, at least five cash advance companies obtained court-ordered judgments against Mr. Wall individually and Mr. Wall doing business as Lighthouse for a total of more than $142,000.

Undisputed SMF ¶ 10; JSOF ¶ 8. The judgments authorized the cash advance companies to garnish Mr. Wall's and Lighthouse's bank accounts, as well as the proceeds from online ticket sales received by Lighthouse's third-party payment processor. Undisputed SMF ¶ 11; JSOF ¶ 9. In addition to ticket sales and cash borrowings, Mr. Wall and Lighthouse raised money by offering investments in promissory notes. Undisputed SMF ¶ 12; JSOF ¶ 10. From approximately January 2014 through October 2018, Mr. Wall and Lighthouse raised more than $3.1 million from approximately 149 investors. Undisputed SMF ¶ 13; Exh. C ¶ 7.

Mr. Wall and Lighthouse solicited promissory note investors through a number of different in-person and electronic means. Undisputed SMF ¶ 14; JSOF ¶ 11. Mr. Wall solicited investors directly at Lighthouse concerts and festivals. Undisputed SMF ¶ 15; JSOF ¶ 12. Lighthouse's website contained a tab titled "Become an Investor" and prompted individuals to submit their names and email addresses if they were interested in becoming a "financial partner" with Lighthouse. Undisputed SMF ¶ 16; JSOF ¶ 13.

Mr. Wall and Lighthouse also used mass marketing email blasts to solicit investors, using the email addresses obtained through online ticket sales and through the entry of email addresses by those who visited the Lighthouse website to indicate interest in becoming "financial partners." Undisputed SMF ¶ 17; JSOF ¶ 14. A typical mass solicitation email, drafted by Mr. Wall, stated:

> Become a financial partner with our summer festivals. Help us spread the message of Christ plus earn 20% on your investment. To learn more please e-mail Jeff Wall at jeff@thelighthouseevents.com.

Undisputed SMF ¶ 18; JSOF ¶ 15.

The individuals who received these emails resided throughout New England, the Mid-Atlantic, and some southern states. Undisputed SMF ¶ 19; JSOF ¶ 16. Mr. Wall and Lighthouse did not have any information about these individuals' finances or level of sophistication in making

investments at the time they sent these email blasts. Undisputed SMF ¶ 20; JSOF ¶ 17. Similarly, prior to accepting investor money and executing promissory notes, Mr. Wall did not ask investors about their finances or investment experience. Undisputed SMF ¶ 21; JSOF ¶ 18. Mr. Wall contacted potential investors who showed interest in learning more about the specific terms of the offered investment by email and phone. Undisputed SMF ¶ 22; JSOF ¶ 19.

Mr. Wall falsely represented that investor money would be used exclusively for costs associated with Lighthouse's music concerts and festivals. Undisputed SMF ¶ 24; Exh. A (ECF No. 16-1) thereto at 39-40. Some promissory notes specified the particular concert or festival for which the investor's funds would exclusively be used, while others were more general, *e.g.*, "2018 summer concerts." Undisputed SMF ¶ 25; JSOF ¶ 20. Mr. Wall and Lighthouse never implemented any mechanism to track the use of investor funds to ensure that they were used exclusively for the stated purpose. Undisputed SMF ¶ 26; JSOF ¶ 21.

For example, in September 2017, Mr. Wall solicited John Motyl to invest $75,000 in Lighthouse exclusively to fund a future festival contemplated to be held at a venue in Kentucky called the "Ark Encounter." Undisputed SMF ¶ 26; Exh. F (ECF No. 16-6) thereto ¶¶ 5-9. Instead of allocating Mr. Motyl's funds exclusively to expenses related to the organization and execution of that festival, Mr. Wall and Lighthouse immediately used his funds to pay expenses owed to several artists who were then performing at a separate festival in Kentucky unrelated to the future Ark Encounter festival. Undisputed SMF ¶ 26; Exh. C ¶ 10. Mr. Wall also used some of Mr. Motyl's money to pay personal expenses, including charges at pharmacies, as well as payments to his father. Undisputed SMF ¶ 26; Exh. D (ECF No. 16-4) thereto at 57-58, 70-71. The Ark Encounter never took place, yet Mr. Wall and Lighthouse kept $67,500 of Mr. Motyl's investment. Undisputed SMF ¶ 26; Exh. F ¶¶ 20-21.

Mr. Wall primarily used one Lighthouse bank account to deposit all Lighthouse revenues and pay all expenses.  Undisputed SMF ¶ 27; JSOF ¶ 22.  As the profitability of Lighthouse's concerts and festivals dwindled and its borrowing from cash advance companies increased, investor funds were used for the payment of daily remittances and court-ordered judgments to the cash advance companies as well as for payments to prior investors on older promissory notes rather than the uses that Mr. Wall had promised.  Undisputed SMF ¶ 27; Exh. A at 47, 142-43, 149; Exh. B (ECF No. 16-2) to Undisputed SMF at 66, 107; Exh. D at 71-74.

Mr. Wall "guaranteed" the repayment of the promissory notes in monthly installments with a fixed annual return ranging from 10 percent to 25 percent.  Undisputed SMF ¶ 28; JSOF ¶ 23.  Mr. Wall's sole basis for guaranteeing the repayment of the promissory notes was his prior experience repaying investors their investments.  Undisputed SMF ¶ 28; Exh. B at 108.  Mr. Wall told prospective investors that the promissory notes were "secured," explicitly stating to some investors that repayment of principal plus interest was not dependent on the success of any concert or music festival.  Undisputed SMF ¶ 29; JSOF ¶ 24.  Neither Mr. Wall nor Lighthouse ever pledged any collateral to secure the promissory notes.  Undisputed SMF ¶ 29; JSOF ¶ 25.  Lighthouse's only assets were its bank accounts.  Undisputed SMF ¶ 30; JSOF ¶ 26.

Mr. Wall claimed that all prior investors had been paid back 100 percent of the money invested.  Undisputed SMF ¶ 31; JSOF ¶ 27.  However, by at least 2016, Mr. Wall and Lighthouse had failed to fully repay some investors and had failed to pay a single installment to others.  Undisputed SMF ¶ 32; Exh. C ¶ 11.

Mr. Wall did not disclose to investors Lighthouse's deteriorating financial condition from declining ticket sales, its growing debt to other individual investors and commercial lenders, or that the only way Lighthouse could repay potential investors was if its concerts and festivals were

profitable.  Undisputed SMF ¶ 33; Exh. E (ECF No. 16-5) thereto ¶ 12; Exh. F ¶ 22; Exh. G (ECF No. 16-7) to Undisputed SMF ¶ 10.  Mr. Wall's representations concerning Lighthouse and the promissory note investments were important to investors.  Undisputed SMF ¶ 34; Exh. E ¶¶ 10, 12; Exh. F ¶¶ 7, 22; Exh. G ¶¶ 7, 10.  Mr. Wall and Lighthouse obtained investor funds as a result of these misstatements and omissions.  Undisputed SMF ¶ 35; Exh. E ¶¶ 10, 12; Exh. F ¶¶ 7, 22; Exh. G ¶¶ 7, 10.  Mr. Wall used some of these funds to repay his own financial obligations, such as the short-term cash advances and court-ordered judgments.  Undisputed SMF ¶ 36; Exh. A at 142-43, 149; Exh. C ¶¶ 9-10.

Mr. Wall and Lighthouse raised funds from approximately 149 investors, comprising individuals, families, and entities who invested in Lighthouse promissory notes.  Undisputed SMF ¶ 37; JSOF ¶ 28.  Mr. Wall and Lighthouse raised $3,154,051 in principal from these investors. Undisputed SMF ¶ 38; JSOF ¶ 29; Exh. C ¶ 7.  Mr. Wall and Lighthouse owe a total of $1,589,815 in unpaid principal to approximately 90 investors.  Undisputed SMF ¶ 39; JSOF ¶ 30.  For those investors who have not been fully repaid, some investors have not received a single installment payment from Mr. Wall and Lighthouse.  Undisputed SMF ¶ 40; Exh. C ¶ 11.

Mr. Wall and Lighthouse did not register the promissory note offering with the SEC. Undisputed SMF ¶ 41; JSOF ¶ 31.  The Maine Office of Securities, which is responsible for regulating securities investments in the State of Maine, sent Mr. Wall a letter on April 17, 2018, mandating that he stop issuing unregistered securities in the form of promissory notes.  Undisputed SMF ¶ 42; JSOF ¶ 32.  After receiving that letter, Mr. Wall executed additional promissory notes and deposited investor funds in Lighthouse's bank account.  Undisputed SMF ¶ 43; JSOF ¶ 33.

### III. Discussion

### A. Liability for Securities Violations

The SEC seeks summary judgment as to all three claims against Mr. Wall and Lighthouse on the bases that, (i) as a threshold matter, the Lighthouse promissory notes are securities for purposes of the Securities Act and the Exchange Act, and (ii) there is no genuine dispute that the defendants committed securities fraud in violation of Securities Act Section 17(a), Exchange Act Section 10(b), and Rule 10b-5, or that they offered and sold unregistered securities in violation of Securities Act Section 5. *See* Motion at 3-11. I agree.

### 1. Whether Promissory Notes Qualified as Securities

The Supreme Court has identified four factors relevant to the assessment of whether a note qualifies as a "security" for purposes of the federal securities laws: (i) "the motivations that would prompt a reasonable seller and buyer to enter into it[,]" (ii) "the plan of distribution of the instrument," (iii) "the reasonable expectations of the investing public[,]" and (iv) "whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." *Reves v. Ernst & Young*, 494 U.S. 56, 65-67 (1990) (citations and internal quotation marks omitted).

That test is met here. First, Mr. Wall's representations to potential investors, including that investor monies would be used exclusively for Lighthouse's music concerts and festivals and that repayment was guaranteed with a fixed annual return ranging from 10 percent to 25 percent, were important to investors. *See* Undisputed SMF ¶¶ 24-26, 28-29, 31, 34; *SEC v. Thompson*, 732 F.3d 1151, 1162-63 (10th Cir. 2013) ("attractive interest rate" was "strong evidence that holders were interested primarily in the profit the note was expected to generate") (citation and internal punctuation omitted). Indeed, Mr. Wall pitched the purchase of the notes as a chance to become a "'financial partner'" or an "'[i]nvestor'" and earn a guaranteed return on an "'investment.'"

Undisputed SMF ¶¶ 16, 18; *Thompson*, 732 F.3d at 1162 ("If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a security.") (citation and internal quotation marks omitted).

Second, the notes were offered through direct, indiscriminate solicitation of any investor who might be attracted either by the nature of Lighthouse's business or the promise of above-market interest rates in return, regardless of the investor's level of sophistication. *See* Undisputed SMF ¶¶ 14-22, 34; *SEC v. Zada*, 787 F.3d 375, 381 (6th Cir. 2015) ("If notes are sold to a wide range of unsophisticated people, as opposed to a handful of institutional investors, the notes are more likely to be securities.").

Third, in these circumstances, the public could have harbored a reasonable expectation that Lighthouse's notes operated, in effect, as securities. *See, e.g., id.* (because "Zada's victims thought they were making lucrative investments in oil" and "federal securities laws are broad enough to cover virtually any marketable investment[,] . . . a reasonable person who gave Zada money to invest in oil markets would expect that the securities laws apply to the transaction").

Finally, the defendants identify no other regulatory scheme that would render the applications of the securities laws unnecessary.

The promissory notes at issue, hence, are "securities" for purposes of the Securities Act and the Exchange Act.

### 2.  Whether Defendants Committed Securities Fraud

### a.  Applicable Legal Standard

"The federal securities laws ban fraud and other deceptive practices in connection with the purchase and sale of securities." *SEC v. Ficken*, 546 F.3d 45, 47 (1st Cir. 2008). "[T]o prove a violation of Section 10(b), Rule 10b-5, and Section 17(a)(1), the SEC must demonstrate that [the]

[d]efendant: (1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities" in interstate commerce. *SEC v. Cole*, No. 12-cv-8167 (RJS), 2015 WL 5737275, at *5 (S.D.N.Y. Sept. 19, 2015) (citation, internal quotation marks, and emphasis omitted); 17 C.F.R. § 240.10b-5 (unlawful "for any person . . . by use of any means or instrumentality of interstate commerce, or of the mails or any facility of any national securities exchange," to engage in securities fraud). However, "to prove a violation of Section 17(a)(2) and (a)(3), the SEC need only show negligence, rather than scienter." *Cole*, 2015 WL 5737275, at *5.

A misrepresentation is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (citation and internal quotation marks omitted). The actions and scienter of Mr. Wall may be imputed to Lighthouse. *See, e.g., SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1096 n.16 (2d Cir. 1972) (scienter of an individual is imputed to a business entity that he or she controls).

"Scienter is an intention to deceive, manipulate, or defraud." *Ficken*, 546 F.3d at 47 (citation and internal quotation marks omitted). "In [the First] [C]ircuit, proving scienter requires a showing of either conscious intent to defraud or a high degree of recklessness." *Id*. (citation and internal quotation marks omitted). "Recklessness is a highly unreasonable omission, involving not merely simple, or even inexcusable[,] negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it." *Id*. (citation and internal quotation marks omitted) (comma added).

**b. Analysis**

The SEC's evidence suffices to establish that Mr. Wall and Lighthouse made material misstatements and omissions with scienter in connection with the purchase and sale of securities in interstate commerce, in violation of Section 10(b) and Rule 10b-5 of the Exchange Act and Section 17(a) of the Securities Act.

First, the SEC demonstrates that Mr. Wall and Lighthouse solicited investors through multiple, repeated, brazen misrepresentations about the offered promissory notes, including the use to which they would put investors' money, the guarantee of a profit of between 10 and 25 percent, the claim that the investments were "secured," and the assertion that prior investors had been paid back in full, *see* Undisputed SMF ¶¶ 24-32, while simultaneously omitting to disclose Lighthouse's deteriorating financial condition, growing debt, and inability to fully repay investors, *see id*. ¶ 33. As the SEC argues, these facts "paint a compelling picture of the disregard for the truth that permeated Wall's and Lighthouse's statements to prospective investors." Motion at 8.

Second, the SEC establishes that the misrepresentations and omissions were material, that is, that there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Levinson*, 485 U.S. at 231-32 (citation and internal quotation marks omitted). A showing of materiality does not require proof that accurate disclosure would have caused an investor to change his or her decision but only that the disclosure "would have assumed actual significance in the [investor's] deliberations[.]" *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

In this case, as the SEC argues, *see* Motion at 8, a reasonable investor would want to know that (i) his or her investments were not "secured," (ii) the promised return was not "guaranteed," (iii) the defendants had implemented no mechanism to track investors' funds to ensure they were

used for the stated purposes and had used investor funds to pay personal expenses, (iv) Lighthouse's financial condition had been deteriorating, and (v) the defendants did not in fact repay 100 percent of prior investors. *See* Undisputed SMF ¶¶ 26-33; *SEC v. Watkins*, 317 F. Supp. 3d 1244, 1254-55 (N.D. Ga. 2018), *appeal docketed*, No. 19-12765 (11th Cir. July 23, 2019) (promissory note payee's misrepresentations were material when he represented that the money would be used for a waste-to-ethanol partnership but in fact used it to repay prior investors and his personal loans); *SEC v. Torchia*, 183 F. Supp. 3d 1291, 1320 (N.D. Ga. 2016) ("Defendants made material misstatements when they told investors that the promissory notes were '100% asset backed' and 'backed by hard assets dollar for dollar'" while failing "to disclose their losses and true financial circumstances to investors.").

Third, the SEC establishes that the misrepresentations involved interstate commerce through emails and other means. *See* Undisputed SMF ¶¶ 14-17.

Fourth, and finally, the SEC demonstrates that the defendants acted with scienter. Mr. Wall and Lighthouse made repeated false representations about the safety and security of the investments at issue, including that repayment was "guaranteed," the investments were "secured," and all prior investors had been paid back 100 percent, while using invested funds to repay high-interest debt and other personal expenses as well as to repay prior investors and failing to disclose Lighthouse's deteriorating financial condition. *See id.* ¶¶ 26-29, 31-32; *Watkins*, 317 F. Supp. 3d at 1257-58 (SEC established that defendant acted with scienter when his conduct in misrepresenting the use of promissory note funds "was such an extreme departure of the standards of ordinary care that it is obvious that he must have been aware his statements presented a danger of misleading buyers") (citation and internal punctuation omitted); *Torchia*, 183 F. Supp. 3d at 1320-21 (defendants were, "at the very least, severely reckless in offering the promissory notes for

sale to investors" but "fail[ing] to inform investors of their poor financial health, choosing instead to state that [one of the defendants] *could* incur losses"). Finally, scienter is further established by the defendants' failure to heed the Maine Office of Securities' directive that they cease selling unregistered securities, continuing to execute additional promissory notes and deposit more investor funds even after receipt of the letter containing that directive. Undisputed SMF ¶¶ 42-43.

There is, accordingly, no genuine dispute that the defendants committed securities fraud in violation of Section 10(b), Rule 10b-5, and Section 17(a).

### 3. Whether Defendants Offered and Sold Unregistered Securities

#### a. Applicable Legal Standard

Absent exemption from registration, Sections 5(a) and (c) of the Securities Act prohibit any person from directly or indirectly selling or offering to sell a security in interstate commerce without a registration statement. *See* 15 U.S.C. § 77e(a), (c). To make a *prima facie* case of violation of Sections 5(a) and (c), the SEC must show that "(1) no registration statement was in effect as to the securities; (2) the defendant directly or indirectly offered to sell the securities; and (3) the offer or sales were made in connection with the use of interstate transportation, communication, or the mails." *SEC v. Tropikgadget FZE.*, 146 F. Supp. 3d 270, 280 (D. Mass. 2015). If that showing is made, the burden shifts to the defendant to prove that the securities offered or the transactions at issue qualify for an exemption from registration. *See, e.g, SEC v. Longfin Corp.*, 316 F. Supp. 3d 743, 756 (S.D.N.Y. 2018). The SEC need not show that a defendant acted with scienter to prove a Section 5 violation. *See, e.g., SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 859-60 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 1348 (2d Cir. 1998).

#### b. Analysis

In this case, the SEC's showing suffices to establish a *prima facie* case that Mr. Wall and Lighthouse violated Section 5 in connection with the promissory note program. Neither has ever

filed a registration statement with the SEC, *see* Undisputed SMF ¶ 41, and the offers and sales were made through the use of interstate facilities, including by email, *see id*. ¶¶ 14-17. The defendants offer no evidence that they qualify for an exemption. In any event, as the SEC notes, *see* Motion at 11, no exemption is available when, as here, a defendant conducts a general solicitation without regard to individuals' finances, level of sophistication in making investments, or prior investment experience, *see* Undisputed SMF ¶¶ 14-22; *SEC v. Opulentica, LLC*, 479 F. Supp. 2d 319, 328 (S.D.N.Y. 2007).

There is no genuine dispute of material fact that the defendants offered and sold unregistered securities in violation of Sections 5(a) and 5(c) of the Securities Act.

## B. Relief Sought

"The court has broad discretion to impose civil remedies" for securities law violations. *SEC v. Sunwest Mgmt., Inc.*, No. 6:09-cv-6056-HO, 2012 WL 9585419, at *1 (D. Or. Oct. 5, 2012). For the violations at issue, the SEC seeks relief in the form of permanent injunctions, disgorgement of ill-gotten gains, prejudgment interest, and civil monetary penalties. *See* Complaint, Prayer for Relief, §§ A-D; Motion at 12. These remedies are appropriate in the circumstances.

### 1. Permanent Injunctions

First, the SEC seeks permanent injunctions against Mr. Wall and Lighthouse enjoining them from engaging in future violations of Exchange Act Section 10(b) and Rule 10b-5 and Securities Act Sections 5(a), 5(c), and 17(a) and from offering and selling securities. *See* Motion at 12-14; Complaint, Prayer for Relief, §§ A-B.

Section 20(b) of the Securities Act and Section 21(d)(1) of the Exchange Act provide for the remedy of a permanent injunction against further violations of the federal securities laws. *See* 15 U.S.C. §§ 77t(b), 78u(d)(1). "An injunction is appropriate if the Court determines there is a reasonable likelihood that the defendant will violate the laws again in the future." *SEC v. Druffner*,

517 F. Supp. 2d 502, 513 (D. Mass. 2007), *aff'd sub nom. SEC v. Ficken*, 546 F.3d 45 (1st Cir. 2008). To assess whether such a likelihood exists, courts consider "whether a defendant's violation was isolated or part of a pattern, whether the violation was flagrant and deliberate or merely technical in nature, and whether the defendant's business will present opportunities to violate the law in the future." *Id.* (citation and internal quotation marks omitted).

Such relief is warranted here. First, the defendants' violations were part of a pattern lasting more than four years and harming approximately 90 investors. *See* Undisputed SMF ¶¶ 13, 39. Second, as discussed above, the conduct was flagrant and deliberate, involving blatant misrepresentations concerning the safety, security, and purpose of the investment and glaring omissions to report the risks. *See id.* ¶¶ 26-29, 31-32. Further, the defendants preyed upon people who shared Mr. Wall's religious beliefs. *See id.* ¶ 18. There is no evidence that the defendants have admitted their misconduct or given assurances against future misconduct. The SEC, thus, has shown a reasonable likelihood that the defendants will violate the securities laws again in the future. *See, e.g., SEC v. Johnston*, 368 F. Supp. 3d 247, 255-56 (D. Mass. 2019), *appeal docketed*, No. 19-2264 (1st Cir. Dec. 12, 2019) (permanently enjoining defendant from violating securities laws upon finding that his "fraudulent conduct was deliberate but not flagrant and that he may well be presented with opportunities to violate the law in the future"); *SEC v. Deyon*, 977 F. Supp. 510, 519 (D. Me. 1997), *aff'd*, 201 F.3d 428 (1st Cir. 1998) (injunction appropriate when defendant "exploited his position as president and minister of the Door of Faith Church to convince unsuspecting people to give their money to a program that he recklessly endorsed" and gave "no assurances that he will not continue to do so in the future").

The SEC further seeks an injunction that prohibits the defendants from "'directly or indirectly, including, but not limited to, through any entity owned or controlled by Wall or

Lighthouse, . . . participating in the issuance, purchase, offer, or sale of any security, provided, however, that such an injunction shall not prevent Wall from purchasing or selling securities for his own personal account.'" Motion at 14 (quoting Complaint, Prayer for Relief, § B).

This requested relief, too, is appropriate. Mr. Wall and Lighthouse were not in the business of selling securities, should not have been, and should not be in the future. Rather, they were promoters and organizers of Christian music concerts, a business that they remain free to pursue. While, insofar as the record reveals, the defendants are first-time violators of securities laws, their conduct was egregious, and they cast a wide net in trolling for potential investors, indiscriminately inviting anyone with access to the internet and an interest in Christian music to fall victim to their fraudulent scheme. This ban, which does not deprive Mr. Wall of his living or the opportunity to purchase and sell securities for his own personal account, maximizes the protection available to the unsuspecting public from any similar such endeavor by Mr. Wall or Lighthouse again.[3]

### 2. Disgorgement Plus Prejudgment Interest

Second, the SEC seeks a judgment ordering Mr. Wall and Lighthouse to disgorge ill-gotten gains in the sum of $1,589,815, together with prejudgment interest of $202,056, on a joint and several basis. *See* Motion at 15; Complaint, Prayer for Relief, § C. "Again, the court has broad discretion with respect to the disgorgement of ill-gotten gains." *Sunwest*, 2012 WL 9585419, at *2. Disgorgement "does not serve to punish or fine the wrongdoer, but simply serves to prevent the unjust enrichment." *SEC v. Happ*, 295 F. Supp. 2d 189, 197 (D. Mass. 2003), *aff'd*, 392 F.3d 12 (1st Cir. 2004) (citation and internal quotation marks omitted). The amount to be disgorged

---

[3] The SEC primarily relies on *SEC v. Mattera*, No. 11 Civ. 8323(PKC), 2013 WL 6485949, at *18 (S.D.N.Y. Dec. 9, 2013), for the proposition that the requested conduct-based injunction is appropriate. *See* Motion at 14. In the cited passage of *Mattera*, the court noted that the "stricter injunction" of permanently enjoining the defendant from marketing securities was warranted because, while he was selling the securities at issue in that case, "he was already subject to a permanent injunction against future violations" of securities laws that he apparently had "ignored . . . in its entirety." *Mattera*, 2013 WL 6485949, at *18. However, unlike Mr. Wall and Lighthouse, Mattera was in the business of selling securities. *See id.* at *1.

"need only be a reasonable approximation of profits causally connected to the violation." *Id*., 392 F. 3d at 31 (citation and internal quotation marks omitted). "The government bears the burden to show such an approximation"; however, once it meets that burden, "the burden shifts to the wrongdoer to demonstrate that the figure is not reasonable." *Sunwest*, 2012 WL 9585419, at *2.

It is undisputed that Mr. Wall and Lighthouse raised $3,154,051 in principal from approximately 149 investors in Lighthouse promissory notes and owe a total of $1,589,815 in unpaid principal to approximately 90 investors. Undisputed SMF ¶¶ 37-39. SEC forensic accountant John B. McCann has calculated the prejudgment interest on the sum of $1,589,815 through October 31, 2019, as $202,056, resulting in a total to be disgorged of $1,791,871. Exh. C ¶¶ 7-8. The defendants have offered no evidence calling those figures into question. Joint and several liability is appropriate when a corporation and individual defendants "all were knowing participants who acted closely and collectively[.]" *SEC v. First Jersey Sec., Inc*., 101 F.3d 1450, 1476 (2d Cir. 1996) (citation and internal quotation marks omitted). That was the case with respect to Mr. Wall and Lighthouse, which Mr. Wall founded and of which he was the sole member. *See* Undisputed SMF ¶ 1.

The SEC's request to hold Mr. Wall and Lighthouse jointly and severally liable to disgorge the total sum of $1,589,815 plus prejudgment interest in the sum of $202,056, accordingly, is reasonable and appropriate.[4]

---

[4] While the sum of $202,056 represents prejudgment interest only for the period through October 31, 2019, *see* Exh. C ¶ 8, the SEC has neither sought additional prejudgment interest nor provided a mechanism by which the court may calculate it, *see* Motion at 15-16.

### 3. Imposition of Third-Tier Civil Penalty

Third, and finally, the SEC requests so-called "third-tier" civil penalties against Mr. Wall and Lighthouse, calculating four possible levels of that penalty, using different methodologies, for the court's consideration. *See* Motion at 16-18.

Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act provide that the SEC may seek civil penalties for violations of the federal securities laws. *See* 15 U.S.C. §§ 77t(d), 78u(d)(3). Third-tier penalties, the highest level of civil penalties available, are appropriate when the securities law violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and . . . such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Id*. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii).

A court may impose third-tier civil penalties in an amount that is the greater of (i) $189,427 for each violation by a natural person and $947,130 by an entity, as adjusted for inflation in 2019, or (ii) the "gross amount of pecuniary gain" to the defendant as a result of the securities law violation. *Id*.; *see also* Securities and Exchange Commission, [Release Nos. 33-10604; 34-85118; IA-5111; IC-33373], Adjustments to Civil Monetary Penalty Amounts, sec.gov/rules/other/2019/33-10604.pdf (last visited Mar. 16, 2020).[5]

Using the first methodology, the statutory per-violation dollar amount, courts have calculated penalties in different ways, for example, imposing a penalty for each violation of a statutory provision, *see, e.g., SEC v. Jasper*, 883 F. Supp. 2d 915, 931-32 (N.D. Cal. 2010), *aff'd*,

---

[5] Further inflation adjustments were made to the SEC's civil monetary penalty amounts effective January 15, 2020. *See* Inflation Adjustments to the Civil Monetary Penalties Administered by the Securities and Exchange Commission (as of January 15, 2020), sec.gov/enforce/civil-penalties-inflation-adjustments.htm (last visited Mar. 16, 2020). However, because, as explained below, I have calculated third-tier penalties using the pecuniary gain methodology, I need not consider them.

678 F.3d 1116 (9th Cir. 2012), and multiplying a single statutory penalty by the number of investors affected, *see, e.g., SEC v. Kenton Capital*, *Ltd*., 69 F. Supp. 2d 1,

17 n.15 (D.D.C. 1998) (imposing 12 penalties, one for each investor defrauded).

Some courts have used the second methodology, predicated on pecuniary gain, when the number of transactions at issue renders the imposition of a per-violation penalty "unjust[,]" "inequitable[,]" and "excessively burden[some][.]" *SEC v. CMKM Diamonds, Inc*., 635 F. Supp. 2d 1185, 1192 (D. Nev. 2009); *see also, e.g., SEC v. Valdez*, 661 F. App'x 814, 816 (5th Cir. 2016) (imposing penalty on individual defendant equal to pecuniary gain to him and his business entities when he had "founded, owned, and controlled his business entities[,]" and "the parties' conduct was inseparable").

The SEC calculates three possible third-tier penalties using the per-violation methodology of (i) $568,281 for Mr. Wall and $2,841,390 for Lighthouse derived from multiplying the three violations alleged in the complaint times $189,427 for Mr. Wall and $947,130 for Lighthouse, (ii) $17,048,430 for Mr. Wall and $85,241,700 for Lighthouse derived from multiplying the number of investors who did not receive full repayment of principal invested (90) times $189,427 for Mr. Wall and $947,130 for Lighthouse, and (iii) $51,145,290 for Mr. Wall and $255,725,100 for Lighthouse derived from first multiplying the 90 investors times the three violations alleged in the complaint (270), then multiplying that number (270) times $189,427 for Mr. Wall and $947,130 for Lighthouse. *See* Motion at 18. Finally, the SEC calculates a fourth possible third-tier penalty, using the pecuniary gain methodology, of $1,589,815 for Mr. Wall and $1,589,815 for Lighthouse. *See id*.

The imposition of third-tier penalties plainly is appropriate in this case, which "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement [and]

such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii). However, as in *CMKM Diamonds*, with respect to two of the per-violation calculations, those predicated on (i) the number of investors and (ii) the number of statutes/rules violated times the number of investors, the number of transactions at issue renders the imposition of a per-violation penalty "unjust[,]" "inequitable[,]" and "excessively burden[some][.]" *CMKM Diamonds,* 635 F. Supp. 2d at 1192.

I, therefore, impose third-tier penalties pursuant to the pecuniary gain methodology of $1,589,815 on Mr. Wall and $1,589,815 on Lighthouse. I note that the imposition of the pecuniary gain penalty, totaling $3,179,630 for both defendants, closely aligns with the imposition of the per-violation penalty calculated by multiplying the sum of $189,427 for Mr. Wall and $947,130 for Lighthouse times the three violations alleged in the complaint, resulting in a total penalty for both defendants of $3,409,671.

## IV.  Conclusion

For the foregoing reasons, I **GRANT** the SEC's motion for summary judgment as to all counts of its complaint against Mr. Wall and Lighthouse and, consistent with the final judgment of even date entered on the docket in this case, (i) permanently enjoin each of the defendants from violating, directly or indirectly, Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder as well as Sections 5 and 17(a) of the Securities Act, (ii) permanently enjoin each of the defendants or any entity owned or controlled by them from directly or indirectly participating in the issuance, purchase, offer, or sale of any security; provided that this shall not prevent Mr. Wall from purchasing or selling securities for his own personal accounts, (iii) decree the defendants jointly and severally liable for the disgorgement of $1,589,815 in profits gained as a result of the conduct alleged in the complaint, together with $202,056 in interest thereon, for a total of $1,791,871, and (iv) impose civil penalties in the sum of $1,589,815 on Mr. Wall

individually and $1,589,815 on Lighthouse individually.

Dated this 31st day of March, 2020.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge